Ervin Steiner and Olga Steiner v. Commissioner.
Steiner v. Commissioner
Docket No. 86509.
United States Tax Court
T.C. Memo 1963-143; 1963 Tax Ct. Memo LEXIS 200; 22 T.C.M. (CCH) 670; T.C.M. (RIA) 63143; May 24, 1963
*200 Andrew F. Slaby for the petitioners. William J. Wise for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in the income tax of the petitioners and additions to tax for negligence for the indicated year as follows: Addition to tax
Sec. 6653(a),
Year
Deficiency
I.R.C. 1954
1957
$827.76
$41.39
1958
752.56
37.63
The issues for determination are the correctness of the respondent's action in determining (1) the amount of income received by petitioner Olga Steiner as tips during 1957 and 1958, and (2) in determining that petitioners were liable for an addition to tax under section 6653(a) of the Internal Revenue Code of 1954 for each of the taxable years. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioners are residents of Milwaukee, Wisconsin, and timely filed their joint Federal income tax returns for 1957 and 1958 with the district director in that city. Since petitioner Ervin Steiner is involved herein only because he and Olga Steiner filed joint income tax returns for the years *201 in issue, the latter sometimes hereinafter will be referred to as petitioner. During 1957 and 1958 the petitioner was employed as a waitress at the George Diamond Steak House, sometimes hereinafter referred to as Diamond, in Milwaukee, Wisconsin. The petitioner has done waitress work practically all of her adult life and during the years in issue was an experienced waitress. Throughout the years in issue Diamond was located in the Republican Hotel, an older building, situated at Kilbourn Avenue and Third Street, in the downtown area of Milwaukee. The side walls of the interior of Diamond were paneled with dark wood and there was a large stone fireplace in the rear. A diamond-shaped service bar at which were six stools was located in an ante-room outside the entrance to the dining room. There were 29 tables of an undisclosed total seating capacity in the dining room. During the years in issue Diamond specialized in corn-fed steer steaks, personally selected by George Diamond. The menu emphasized steak dinners which included salad, potatoes, coffee, rolls and butter and ranged in price from hamburger steak at $1.50 to sirloin steak at $2.95 and T-bone steak at $3.95. Diamond was *202 a fast turnover type of dining place as contrasted with a leisurely type. In 1957 and 1958 the petitioner's working hours at Diamond were from 5 p.m. until 1 a.m. daily except Tuesdays and Thursdays which were her regular days off duty. In addition, she was off duty one Sunday in each month. The petitioner's station during the years in issue consisted of what was called the "stag table" and two other nearby tables. The petitioner served both food and liquor to customers. In addition, she sold to customers at tables to take out undisclosed total amounts of bottled dressings ranging in prices from 45 cents per bottle, or 3 bottles for $1.25, to quart-sized bottles at $1.65 each. On some occasions the petitioner received from customers at tables, orders for bottled dressings to be mailed. The preparation of bottled dressings to be mailed was rotated among the waitresses at Diamond. Occasionally the petitioner sold bottled dressings to persons who came to the dining room merely to purchase such dressings and not for table service. Except in rare instances involving nominal amounts, the petitioner listed on customers' checks the sales made by her of bottled dressings and orders for *203 such dressings to be mailed. During the years in issue, Diamond's sales of bottled dressings constituted about one-half of one percent of its total food sales. At Diamond during the years in issue waitresses were required to pay for the glass coffee pots used for serving which were broken by them. Also the waitresses were responsible for the payment of checks of customers who walked out without making payment therefor and were responsible for the payment of the bills for cleaning garments of customers which the waitresses had solied by spillage. Each waitress carried a wallet with funds therein with which she did the cashiering as to the checks of the customers whom she served. The waitresses were responsible for making payment for shortages resulting from their errors in totaling the amount of the customers' checks and for errors in making change. During the years in question the petitioner broke 10 coffee pots for which she was required to and did pay Diamond at the rate of $1.35 each, or a total of $13.50. During those years 3 customers served by petitioner walked out without making payment of their checks. One of the checks was for $12. The amounts of the others possibly were *204 between $6 and $12. "Overages" or amounts resulting from the collection from customers of sums in excess of the correct amounts of their checks or from errors in making change were retained in a special fund at Diamond. If the customer from whom an "overage" had been collected was known, the amount thereof was returned to the customer. If the "overage" was not claimed, it was retained in the fund and if a large shortage occurred on the part of any waitress or if a customer walked out without paying his check, part of the fund was used to make up such shortage or as payment of the amount of the unpaid check. The waitresses at Diamond were supposed to give 10 percent of their tips to the bus boy. On occasions during the years in issue the petitioner gave the hostess 25 to 35 cents per evening for serving assistance the hostess rendered her during the evenings. On those Saturday evenings that petitioner was unusually busy and the hostess had rendered considerable serving assistance to her, the petitioner gave her 50 cents. The service bar, heretofore mentioned and at which a bartender was always on duty, was the source of the liquor (1) sold to customers at the bar, (2) served by *205 the waitresses at the dining tables, (3) served by the regularly employed cocktail girl in the lounge, and (4) on occasions when an extra cocktail girl was employed, served by her in the lounge. In accounting for the liquor thus supplied by the bar, Diamond had at the bar a cash register, which was operated by the bartender and on which there were four keys numbered respectively as follows: A-I, A-II, A-III, and A-IV. In addition to servicing the six stools at the bar, the bartender prepared the liquor served by the waitresses and the cocktail girls and which was picked up by them at the bar. Key number A-I was used by the bartender to record cash sales of liquor, that is, sales of liquor served by him to customers at the bar. Key A-II was used by the bartender to record the prices of liquor served by the waitresses at the dining tables. Key A-III was used by him to record the prices of liquor served by the regular cocktail girl in the lounge, and key A-IV was used by him to record the prices of liquor served by the extra cocktail girl in the lounge. The following is a statement of the amounts of the total food sales of Diamond served by all the waitresses and the amounts of such *206 totals served by petitioner during 1957 and 1958, respectively: 1957
1958
Total served by all wait-
resses
$441,801.00
$420,895.00
Served by petitioner
37,007.95
34,596.80
The following is a statement of the amounts of the total liquor sales at Diamond served at tables by all waitresses during 1957 and 1958 as shown on cash register stub A-II: 1957
1958
$51,160
$51,448.20 Diamond maintained no record of the amount of liquor served at tables by individual waitresses. During 1957 and 1958 tipping at Diamond ranged from about 5 percent to 16 percent of the customer's check or bill. The petitioner kept no books or records of her income received as tips during 1957 and 1958. Upon making a survey of tipping habits at dining establishments in Milwaukee, Wisconsin, the respondent determined that the custom was to tip a percentage of the food and liquor bill; that the custom at the better establishments was to tip 15 percent of the bill and at the other establishments to tip approximately 12 or 13 percent of the bill; and that there was a practice of the waitresses paying a portion of their tips to bus boys and hostesses. As a consequence *207 of the foregoing practice of waitresses, the respondent concluded that the 15 percent tip in the case of the better establishments should be reduced to approximately 12 or 13 percent in order to correctly approximate the income received as tips by waitresses at such establishments and that the 12 or 13 percent tip in the case of the other establishments should be reduced to approximately 10 percent to correctly approximate the income received as tips by waitresses at those establishments. Originally the respondent tentatively classified Diamond as among the better dining establishments and concluded that after allowing for reductions on account of payments to bus boys and hostess, 12 percent of the bill was a proper percentage to apply in computing the income received as tips by waitresses at Diamond. Thereafter and upon obtaining from a part owner of Diamond and a participant in the management thereof during 1957 and 1958 and from waitresses employed at Diamond during those years further information relating to tips at Diamond during such years, the respondent determined that a rate of approximately 10 percent of the amount of food and liquor checks or bills was properly applicable *208 in determining the income received as tips by waitresses at Diamond during such years. Since Diamond kept no records of the amount of liquor served at tables by individual waitresses, the respondent in determining the deficiencies determined the percentages of the total food sales of Diamond in 1957 and 1958 which were served by petitioner, namely 8.3 percent and 8.2 percent, respectively, and applied those percentages to the total liquor sales of Diamond served at tables by all waitresses during such years to ascertain the estimated amounts of liquor served at tables by petitioner during such years, namely, $4,246 and $4,218, respectively. On the basis of the foregoing, the totals of food and liquor served by petitioner during 1957 and 1958 were as follows: 1957
1958
Food served
$37,007.95
$34,596.80
Liquor served
4,246.00
4,218.00
Total
$41,253.95
$38,814.80
In her income tax return for 1957 petitioner reported $1,723.09 as wages received from Diamond during that year and $385 as tips received during the year. In her return for 1958 the petitioner reported $1,682.97 as wages received from Diamond during that year and $480.96 as tips received during *209 the year. The $480.96 was explained on the return as "25 1/2% Tips on 1,682.97." In determining the deficiencies the respondent determined that during 1957 and 1958 the petitioner received income as tips in the amounts of $4,093 and $3,770, respectively, and that her unreported income from tips for such years was in the amounts of $3,708 and $3,289.04, respectively. Opinion The petitioners take the position on brief that we should find that petitioner had no income from tips during the years in issue in excess of the amounts reported for those years, $385 and $480.96, respectively, and in the event we are unable to so find, we should hold that "a more equitable formula be substituted for that used by" respondent. The petitioners, however, do not suggest what the contents of such a formula would be or what amounts its application herein would produce. We know of no formula, equitable or otherwise, which properly may be applied as a rule of thumb to ascertain the correct amount of income received by a waitress from tips or any other source. The ultimate question here, as in all like cases, is the correctness of the amounts determined by respondent as income received from tips *210 viewed in the light of the record as a whole and not viewed merely in the light of a formula he may have used in arriving at the amounts determined by him. Dorothy L. Sutherland, 32 T.C. 862 (1959), involved the income tax liability for 1953, 1954, and 1955 of a waitress who, like the petitioner here, did not keep any records of the income received by her as tips. There we pointed out that every taxpayer is required by law to report in his income tax return, fully and honestly, every item of gross income received, and must maintain adequate records of some kind which will show to him and to the Commissioner the amount of income of all types received in each year; that if the taxpayer does not keep any records to show the full amount of every kind of income received in a taxable year, or if such records as are kept do not clearly show the entire income, the Commissioner is authorized to make a computation of the amount of income in accordance with such method as in his opinion does clearly show the full amount of income received; that a computation of income so made by the Commissioner is presumptively correct under law and the taxpayer has the burden of proving that *211 it is erroneous; and that such burden is not discharged by the taxpayer's estimates of income or his unsubstantiated, uncorroborated, and self-serving testimony that the amounts reported in his return are correct. Although the petitioner did not keep any record of the tips she received during the years in issue, she reported income each year as having been received from that source, obviously indicating that she knew that income received from tips constituted taxable income. The record is silent as to how the petitioner computed the amount of $385 reported for 1957 as income received from tips during that year. The amount of $480.96 reported in the return for 1958 as income received from tips during that year is explained in the return as representing 25 1/2 percent on $1,682.97, an amount identical with the amount reported for that year as wages received by petitioner from Diamond during the year. Since 25 1/2 percent of $1,682.97 is only $429.16 and not $480.96 as reported in the return for 1958, it is apparent that either a larger percentage factor was applied to the $1,682.97, possibly approximately 28 1/2 percent, or some other method was used. Irrespective of the method or *212 methods used by petitioner in computing the amounts reported by her for 1957 and 1958 as income received from tips during those years, she, under questioning by her counsel, estimated that with respect to the food alone served by her during the years in issue she received tips amounting to from 7 percent to 7 1/2 percent of the amount of the food she served. Since she served food in the amount of $37,007.95 during 1957 and $34,596.80 during 1958, she, on the basis of her estimate, received tips in 1957 ranging from $2,590.56 to $2,775.60 and in 1958 ranging from $2,421.78 to $2,594.76. In view of the foregoing we obviously are unable to conclude that the amounts reported by petitioner for 1957 and 1958 as income received from tips either fairly or correctly reflected the income received by her from that source during such years. Consequently we are unable to find, as petitioners request, that for such years the petitioner received no income from tips in excess of the amounts reported. For the apparent purpose of establishing the improbability, if not the impossibility, of petitioner's income from tips having been in the amounts determined by respondent, the petitioners, relying on *213 certain testimony of petitioner and other portions of the record, contend on brief that (1) petitioner was required to pay the shortages arising from errors made by her in totaling the checks of customers and in making change, (2) petitioner was required to pay the checks of customers served by her who walked out without paying their checks, (3) petitioner was required to pay the bills for cleaning the clothing of customers which was soiled by her as a result of spillage, (4) because of the overflow of business at Diamond, customers were required to wait for periods of up to an hour before being seated at tables, that during such waiting periods many customers, who before being seated at tables were served liquor at the bar, the amount of which was entered on their checks by the waitresses who served them food at the tables, but with respect to such liquor the waitresses received no tips, and that up to five or six times each evening the petitioner served food at tables to customers who previously had been served liquor at the bar and although she entered the amount of such liquor on the checks of the customers, she received no tips with respect to it, (5) petitioner served considerable *214 quantities of bottled dressings to be taken out and to be mailed which were included on the checks for food served by her and with respect to which she received no tips, (6) petitioner paid the bus boy 10 percent of her tips, (7) petitioner made payments to the hostess of 50 cents each Saturday evening and from 25 cents to 35 cents on each of the other 4 evenings she worked, (8) petitioner was required to pay for coffee pots which she broke, (9) petitioner was required to pay 50 cents each night she worked for a martini for the manager and part owner of Diamond, (10) because of the low prices of food at Diamond it was a "fast turn-over establishment" at which customers did not pay large tips, and (11) during the years in issue petitioner's tips amounted to only about 7 1/2 percent to 8 percent of the food and liquor served by her in those years. The petitioner testified that quite frequently she experienced shortages in her cash receipts, the amounts of which for the years in issue she declined to estimate, and which she was required to pay. The petitioner also testified that during the years in issue 3 customers she had served walked out without paying their checks, one for $12 *215 and the other two for possibly between $6 and $12, which she was required to pay. The petitioner also testified that she experienced "a few" overages in her cash receipts which she turned over to Diamond. Barnet Sklar, who was a part owner of Diamond and during the years in issue participated in the management thereof, testified at the trial as a witness for the respondent. He stated that overages received by waitresses were put in a special fund by Diamond and that if a customer from whom an overage had been obtained was known, it was returned to him; that if an overage was not claimed it was retained in the fund; that if there was a large shortage in the case of a waitress, or if a customer who had been served by a waitress walked out without paying his check, part of the fund was used to make up the shortage or to pay the unpaid check. The petitioners have made no attempt to reconcile the testimony of the petitioner that she paid the shortages in her cash receipts and paid the checks of her customers who walked out without paying their checks with the foregoing testimony of Sklar. Nor have petitioners explained how, in view of the handling of overages by Diamond as described by *216 Sklar, it could be said that petitioner made up her shortages or paid the unpaid checks of customers who walked out. The petitioners made no denial of the existence of the fund or of its sufficiency for making up petitioner's shortages and for paying the unpaid checks of her customers. In such a situation we can only conclude that petitioner has failed to show that she actually made up any substantial shortages or paid the unpaid checks of any of her customers. The record shows that Diamond required that a waitness responsible for the soiling of the clothing of customers by spillage should pay the bill for cleaning the clothing. Viola Hoepfl, a witness for the petitioners, who about 3 evenings a week worked on the same shift as the petitioner, testified that during the years in issue she saw the petitioner on two or three occasions soil the clothing of customers by spillage and that petitioner was required to pay for cleaning the soiled clothing. The witness did not state the amounts or approximate amounts paid for such cleaning or how she knew that the petitioner paid for the cleaning. The testimony of petitioner contains no mention of her having soiled the clothing of any customers *217 or of her having paid any amount or amounts for the cleaning of clothing of customers. As the record stands, we are unable to conclude that petitioner made any such payments during the years in issue. Although the petitioner testified that up to five or six times each evening during the years in issue she served food at tables to customers who previously had been served liquor at the bar and although she entered the amount of such liquor on the checks of customers, she received no tips with respect to it, she was unable to show that the tips she received with respect to such checks did not also relate to the amounts included in the checks for liquor as well as the amounts included for food. The petitioner testified that as a waitress at Diamond during the years in issue she sold bottled dressings; that some of such dressings was sold to customers at tables to be carried out and some orders were taken from customers at tables which were to be mailed out; and that some was sold to persons who came in the dining room merely to purchase some of the dressings. Although stating that the amount in money of the bottled dressings sold by her during the years in issue was large, the petitioner *218 declined to state any particular amount or approximate amount. We have found as a fact that except in rare instances involving nominal amounts the petitioner listed on customers' checks the sales made by her of bottled dressings and orders for such dressings to be mailed. We also have found as a fact that Diamond's sales of bottled dressings during the years in issue constituted about one-half of one percent of its total food sales. If that percentage be applied to the amounts of food shown by petitioner's checks to have been served by her in the respective years, namely, $37,007.95 for 1957 and $34,596.80 for 1958, it would appear that her sales of bottled dressings were about $185 in 1957 and $173 in 1958. While petitioner testified that she never at any time received any tips on her sales of bottled dressings, she did not attempt to show that the tips she received from customers on whose checks had been entered their purchases of bottled dressings did not in anywise relate to the dressings but related only to the food shown on the checks. Although the petitioner testified that waitresses at Diamond were supposed to give the bus boy 10 percent of their tips and that each evening *219 she gave him 10 percent of her tips for the evening, she has furnished us no indication of the amount or the approximate amount she paid him either per evening, per week, per month, or per year during the years in issue. The petitioner's testimony is to the effect that on occasions during the years in issue the petitioner gave the hostess 25 cents to 35 cents per evening for serving assistance the hostess rendered to her during the evening and that on those Saturday evenings that petitioner was unusually busy and the hostess had rendered to petitioner considerable serving assistance she gave the hostess 50 cents. Here again the petitioner has not furnished us any indication as to the number or approximate number of evenings per week, per month, or per year she made payments to the hostess either of from 25 cents to 35 cents or 50 cents or any other information upon which we can determine the amounts paid during the respective years. We have found as a fact that during the years in issue the petitioner broke 10 coffee pots for which she was required to and did pay Diamond at the rate of $1.35 each or a total of $13.50. There is no indication in the record as to the time or times *220 during the 2-year period the breakage occurred. The petitioner testified that she along with the other waitresses was required each evening after work to contribute 50 cents each to purchase at 50 cents each the martinis which a woman manager and part owner of Diamond drank after work. The record shows that during the years in issue there were 29 tables at Diamond and that petitioner served three of those tables. Although the record is silent as to the number of waitresses employed on the shift the petitioner worked, however, on the basis of one waitress to each three tables, it would appear that there were at least 9 waitresses, including the petitioner, who worked on that shift. The petitioner's contention that each of the waitresses was required to buy at 50 cents each the woman manager and part owner of Diamond a martini each evening after work would indicate that such manager and part owner drank at least 9 martinis each evening after work. Such being the implication of the contention and the evidence relied on in support thereof, we can only say that we are not impressed either by the evidence or the contention. We have found as facts that Diamond was a fast turnover type *221 of dining place as contrasted with a leisurely type and that during the years in issue tipping at Diamond ranged from 5 percent to 16 percent of the customer's check or bill. Viola Hoepfl, a witness for the petitioners, who worked 3 nights a week at Diamond on the same shift as petitioner, testified that having been the most recently employed waitress at Diamond during the years in issue, she was assigned to what was regarded at Diamond as the worst station in the establishment. She stated that because of the close proximity of the station to the bar, few people cared to sit at it except when no other seats were available. Despite having had such a station she estimated her tips as having ranged between 6 percent and 7 1/2 percent of her customers' checks. There is no showing, and petitioners make no contention, that Viola Hoepfl was an experienced waitress. Petitioner was an experienced waitress and no showing or contention is made that her station was not among the most desirable at Diamond and among the best for obtaining tips. The amounts determined by respondent as petitioner's income received as tips for the years in issue, $4,093 for 1957 and $3,770 for 1958, are slightly *222 less than 10 percent of the amounts of food served by petitioner during such years and the amounts of liquor served by her during such years as determined by respondent. On the basis of the tipping custom at Diamond during the respective years and on the basis of the remainder of the record, we are unable to find that petitioner received any lesser amounts of income from tips during the respective years than the amounts determined by respondent for such years. In arriving at such conclusion we recognize that such amounts may not be the exact amount of tips received by petitioner during the years in issue but in the situation presented, we consider to be applicable here the following statement contained in Mendelson v. Commissioner, 305 F. 2d 519 (C.A. 7, 1962), certiorari denied, 371 U.S. 877 (1962), in affirming a Memorandum Opinion of this Court: Obviously, where a taxpayer keeps no records disclosing his income, no method can be devised which will produce an exact result. The law does not require that much. It is sufficient if the method employed produces a result which is substantially correct. All taxpayers, including the one here involved, by failure *223 to keep records of their income assume the hazard that they may be called upon to pay a tax based on an income which cannot be determined to a certainty. Such a situation, however, arises from the fault of the taxpayer and not that of the Commissioner. As was said in Dorothy L. Sutherland, supra, taxpayers who receive income as tips but do not keep written records of the tips are "extremely negligent" in failing to keep such records. Since the petitioner did not keep any record of the tips she received during the years in issue and since she received income from tips greatly in excess of the amounts she reported in her returns for those years, we sustain the respondent's determination of additions to tax provided in section 6653(a) of the 1954 Code. Decision will be entered for the respondent.